# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No.: __17-cv-1425_____

**BLACKFEET LIGHTING AND ELECTRICAL TECHNOLOGIES, LLC,** a Colorado limited liability company, individually and on behalf of all others similarly situated**,**

     Plaintiff,

v.

**REGIONAL TRANSPORTATION DISTRICT**, a statutory special district and political subdivision of the State of Colorado,

     Defendant.

---

## CLASS ACTION COMPLAINT AND JURY DEMAND

---

## NATURE OF THE ACTION

1.     In short, this matter challenges the Regional Transportation District's ("RTD") violations of the due process and civil rights of Blackfeet Lighting & Electrical Technologies, LLC ("Blackfeet") a as well as the rights of other DBEs with whom it contracts. On one level, this case is a story about rampant waste and abuse regarding Xerox Transport Solutions, Inc.'s (formerly ACS Transport Solutions, Inc.) ("ACS/Xerox") administration of the Smart Media System Project and the Regional Transportation District's ("RTD") abysmal failure to police it. The project was seriously delayed, has cost over $10,000,000, and, even worse: there still isn't a functioning Smart Card system. The taxpayers have nothing to show for it.

2.     At the same time, this case is a tale about what happens when people who are entrusted to protect the historically disadvantaged skirt the rules in an effort to kowtow to large corporate interests.

3.      While the details are enough to make one's head spin, the key facts are straightforward: ACS/Xerox, one of the World's largest corporations (headquartered in France), approached Blackfeet in or around 2010 about performing electrical work on the Smart Media System Project (the "Project" or the "Smart Card Project"). The Project was intended to outfit Denver's buses, trains, and terminal stations with technology to support a "Smart Card" system—one that would accept re-loadable cards, credit cards, and other forms of payment electronically.

4.      Blackfeet Lighting and Electrical Technologies, LLC, ("Blackfeet") is a certified Disadvantaged Business Enterprise ("DBE") with the Colorado UCP under the electrical code § 10500 and lighting code § 21101, and its presence on the bid undoubtedly helped secure the awarding of the contract for the Project (the "Project Contract") to ACS/Xerox (See "Project Contract" a copy of which is attached hereto as Ex. A).

5.      But all didn't go according to plan: serious delays and overruns hit soon after the Project Contract was supposed to commence, nearly all of it the result of ACS/Xerox's gross mismanagement.[1]

6.      Moreover, ACS/Xerox required that Blackfeet (and RTD, for that matter) perform substantial additional work beyond the Statement of Work ("SOW") in the Project Contract. Indeed, by July/August 2011, ACS/Xerox had caused Blackfeet to incur over $400,000 in change orders.

7.      Yet rather than take responsibility for its actions, ACS/Xerox has refused to pay for the extra work it created.

---

[1] John Stark at RTD detailed ACS/Xerox's mismanagement of the project in an 8-page memo (See Ex. B hereto).

8.      While it is RTD's responsibility to ensure that its prime contractors adhere to all laws, including those pertaining to DBEs, RTD fell far short of doing so here. That is, early on in the project RTD personnel took pains to carefully detail and document ACS/Xerox's serial delays (see par. 25 below for a list of failures); following a personnel change internally at RTD, RTD did an about-face: rather than protect Blackfeet and push ACS/Xerox to fix its delays and compensate Blackfeet for extra work, RTD's new personnel encouraged ACS/Xerox to summarily terminate and replace Blackfeet with respect to certain work, in derogation of federal regulations.

9.      Worse yet, RTD's form Prime Contract Flowdowns, or "FTA Terms", purport to allow ACS/Xerox to simply terminate Blackfeet even though Blackfeet is a DBE and the DBE regulations cited in the Project Contract require notice, an opportunity to be heard, and a finding of good cause by the RTD. *See* 49 C.F.R. § 26.53(f); *see also* Ex. A to Project Contract, attached as Ex. A hereto. This form contract is used by RTD with hundreds (or more) of prime contractors like ACS/Xerox.

10.     Blackfeet submitted a formal complaint to RTD's Civil Rights division in 2014. Throughout an arduous process that included the submission of voluminous materials, RTD's Civil Rights Division determined that ACS/Xerox owed Blackfeet at least $27,016.32, but that with respect to Blackfeet's other claims, RTD's Civil Rights Division did not have sufficient information. (*See* "December 12, 2014 Report of RTD Civil Rights Division," a true and accurate copy of which is attached hereto as Ex. C.)

11.     In September 2015, RTD's Civil Rights division indicated it was closing its file pending litigation. (See "RTD Letter of Sept. 8 2015," a true and accurate copy of which is attached hereto as Ex. D). At that point it became clear that RTD's Civil Rights division was not

3

going to enforce the termination provisions set forth in the federal regulations that require notice, an opportunity to be heard, and a finding of good cause prior to termination by RTD. Indeed, RTD has refused to address such allegations against it whatsoever. This lawsuit follows.

12.    As set forth below, RTD's form contract related to DBEs violates the federal regulations designed to protect DBEs. Following this form contract, RTD sanctions the unlawful termination of DBEs like Blackfeet from federal contacts like the Smart Card Project by ACS/Xerox and other prime contractors.

13.    As such, RTD has violated the due process and civil rights guaranteed to Plaintiff Blackfeet and other DBEs under the Fourteenth Amendment, 28 U.S.C. § 1983 *et seq*., and 28 U.S.C. § 1981 *et. seq*. As explained below, Plaintiff seeks classwide injunctive and declaratory relief, as well as any allowable damages plus costs and reasonable attorneys fees.

## JURISDICTION

14.    This Court has jurisdiction over the subject matter of this case under 28 U.S.C. § 1331 *et seq*. as this matter raises questions of federal law and claims under the United States Constitution and under federal statutes, including 28 U.S.C. §§ 1981 and 1983.

15.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) as unlawful practices are alleged to have been committed in or directed to people and places in this District and Defendant regularly conducts business in this District.

## PARTIES

16.    Plaintiff Blackfeet Lighting and Electrical Technologies, LLC ("Blackfeet") was organized under the laws of and is licensed to do business in the State of Colorado. At all times relevant, Blackfeet was a certified Disadvantaged Business Enterprise ("DBE") with the Colorado UCP under the electrical code § 10500 and lighting code § 21101.

4

17.     Defendant Regional Transportation District ("RTD") is a statutory special district and political subdivision of the State of Colorado. RTD was organized in 1969 as the regional authority operating public transit services in eight out of the twelve counties in the Denver-Aurora-Boulder Combined Statistical Area in Colorado. RTD is governed by a 15-member, publicly elected Board of Directors. RTD operates a bus and rail system that has a service area of 2,337 square miles (6,050 km[2]). It employed 2,734 people and reported 103 million boardings in 2016.[2]

## FACTUAL BACKGROUND

### *ACS/Xerox Solicits Blackfeet to be its DBE Electrical Contractor on the Smart Card Project*

18.     Blackfeet is a Native-American owned electrical company operating throughout the front range of Colorado.

19.     In or around 2010, Xerox Transport Solutions, Inc. (formerly ACS Transport Solutions, Inc.) ("ACS/Xerox") approached Blackfeet about performing electrical work for the RTD's Smart Card Project.

20.      The subcontract agreement between ACS/Xerox and Blackfeet was executed on August 23, 2010 for a fixed price of $636,417.43 for labor and materials. The subcontract agreement ("Project Contract") was eventually amended effective April 17, 2012 to adjust the performance schedule and to acknowledge that Blackfeet had already been paid $669,041.74 and to provide for five additional payments of $17,225.54 (totaling $86,127.70), plus another payment of $20,000.

21.     Ultimately, ACS/Xerox paid Blackfeet $803,930.23. However, an additional balance of $428,993.29 in change orders—caused almost entirely by ACS/Xerox's delays and

---

[2] https://en.wikipedia.org/wiki/Regional_Transportation_District (last visited June 8, 2017).

mismanagement of the Project and Project Contract and RTD's failure to require that ACS/Xerox follow the law—remains outstanding.

***ACS/Xerox Causes Repeated Delays That Are Documented by RTD and Blackfeet***

22.     Almost from the get-go, ACS/Xerox started unilaterally changing the terms of the Project Contract – offering to use different equipment, failing to send complete parts, failing to perform pre-assembly testing, changing the IP addresses to be used – and causing a host of other problems.

23.     The delays were substantial, placed additional burdens on Plaintiff and on RTD, and were outside the SOW.

24.     Plaintiff sought to involve RTD and was initially successful. John Stark of RTD was intimately involved in the Project and witnessed first-hand ACS/Xerox's failures to perform, and its mistreatment of Blackfeet (causing Blackfeet to incur substantial costs due to the delays without providing appropriate compensation, delaying payments, etc.).

25.     Mr. Stark memorialized ACS/Xerox's misconduct in an email to George Hovey on July 28, 2011. As detailed by Mr. Stark, among other failures, misconduct, and omissions, ACS/Xerox:

- shipped incomplete "kits" so that Blackfeet couldn't finish complete installations;

- demanded that RTD use an "Orbstar mobile data terminal" that had a 6 month lead time and came with programming issues;

- provided validators with programming issues (wherein it was revealed ACS/Xerox had failed to perform adequate testing prior to programming);

- demanded that Blackfeet create prototypes and attendant documentation beyond the SOW and without providing samples;

- added a new power junction box that required multiple design reviews and approvals;

- sent non-working platform validators;

- committed electrical code violations;

- switched the type of cellular modem (to the "Raven") to be used which did not work with RTD's VPN network devices;

- failed to provide database ERDs and data dictionaries as requested by RTD and to provide other data requested by RTD;

- failed to deliver necessary software on time and CRM software that had many issues that needed to be changed via a "punchlist" which was updated;

- failed to allocate or secure adequate human resources with necessary skillsets (RTD found one ACS web developer who didn't know how to access servers and databases);

- provided a web portal with significant issues that needed to be addressed;

- failed to provide handheld software as promised;

- provided software for the on-board validator to communicate with the garage concentrator via File Transfer Protocol using both active and passive commands (the use of active FTP commands was problematic over the National Address Translated ("NAT") network and caused further issues and delays);

- provided validators and garage concentrators with coding issues such that communications between the validators and the garage concentrators were disrupted (the concentrator would close the FTP session after processing 20 files). Following substantial testing and delays, it was finally deduced that a registry key was omitted from ACS's installation package that caused the software to disconnect prematurely;

- provided devices with out of the box IP addresses that did not meet any of RTD's requirements (despite the fact that the SOW specifically identified the WiFi network being used at RTD and placed the burden on ACS/Xerox to provide network IP configuration);

- neglected to provide expertise, instead relying on In Motion and RTD to troubleshoot and fix ACS/Xerox's oversights;

- provided faulty Ubiquity WAN cards for installation;

- provided master configuration that failed to allow for the maximum availability of channel pairs;

- with respect to LAN configuration, provided devices with improper IP addresses that fell outside the SOW. ACS/Xerox needed an additional 6-8 weeks just to obtain a device with an infrared port that would allow it to update its validators with the correct IP addresses;

- provided faulty stickers;

- failed to apprise RTD that it could only pre-print smart cards that contained a "white space" for a photograph to be printed within, forcing RTD to order replacement cards;

- failed to deliver 500 rolls of thermal paper as required by the agreement, forcing one project to purchase its own paper;

- failed to provide RTD with regular project timeline updates showing progress and delays, failed to apprise the RTD Executive Sponsors and Steering Committee of such matters at meetings, and continually showed "poor organization and prioritization when it comes to meeting its deliverables.";

- failed to provide adequate and quality software design documentation;

- despite representing to RTD that it had a broad team of development and implementation specialist to commit to the Project, it was ultimately learned that ACS/Xerox's implementation team was comprised of only two people: System Engineer Guillaume Bonnet and Program Manager Massimo Rolle;

- repeatedly cited French holidays for delays;

- failed to maintain an issue list and/or share such a list with RTD;

- relied repeatedly on RTD personnel to perform updates and testing when ACS is responsible for such work;

- failed to include RTD personnel on key communications and emails; and

- imposed a great deal of extra work on Blackfeet without payment for such work.

(See "July 2011 Stark Memo," a true and accurate copy of which is attached as Ex. B).

26.    ACS/Xerox was well aware of all of this through multiple communications with Blackfeet and with RTD. These delays forced Blackfeet to perform extra work that resulted in the submission of change orders in June 2011 - August 2011 that totaled over $400,000.

27.     ACS/Xerox initially agreed to compensate Blackfeet via change orders that Blackfeet submitted for payment. ACS/Xerox delayed payment for several months however. All of this led to the need for an amendment to the Project Contract and a comprehensive change order that would revise the performance schedule on a going-forward basis.

***Rather than Help Blackfeet, RTD Helped ACS/Xerox Replace Blackfeet on the Project Without Notice, and Opportunity to Be Heard, or a Finding of Good Cause***

28.     Prior to the execution of the amended contract and change order, RTD employees like Michael Washington urged others at RTD to require that ACS/Xerox resolve the outstanding issues with Blackfeet, namely the payment delays for the change orders that ACS/Xerox had agreed to pay, as part of the execution of the April 17, 2012 amendment to the Project Contract.

29.     In August 2011, after Mr. Stark's Memo, it was decided internally at RTD that Gary Googins would take over the project from Mr. Stark.

30.     In a meeting held in early October 2011, RTD informed ACS/Xerox that it wanted the outstanding issues with Blackfeet to be resolved through the change order that was being used to amend the project schedule.

31.     On October 19, 2011, Glenn Moore of ACS/Xerox wrote to Linda Wells of RTD stating that ACS/Xerox objected to tying the execution of the change order that would revise the performance schedule to a resolution of the Blackfeet issues. Instead, ACS/Xerox demanded that the amendment to the Project Contract/change order be treated completely separately from the outstanding Blackfeet issues.

32.     Not everyone at RTD agreed ACS/Xerox's position. As Michael Washington asked of his colleagues on October 20, 2011:

Everyone,

We do acknowledge and understand the concerns surrounding the execution of the revised performance/payment schedule change order being contingent upon resolution of the issue with Blackfeet. However, ACS has signed a letter of Intent to Perform with Blackfeet and their other DBEs; ACS must make a Good Faith Effort to honor these commitments. Our concern is that ACS will not be able to honor this commitment with the current subcontract agreement with Blackfeet. Since Blackfeet is a major contributor to the project as the installation contractor ACS's performance schedule is dependent on the amended subcontract agreement. If ACS is unable to resolve the issue with Blackfeet, it is likely the performance schedule will be impacted. Thus how realistic is the proposed performance schedule without an amended subcontract agreement? ...

33.     Michael Washington was unable to convince the group, however. On October 25, 2011 in an email to Christina Tubb, RTD's Civil Rights Manager who had asked for an update, Washington wrote:

They've decided to execute the change order despite the issues relative to ACS's non-compliance with the DBE requirements. I understand the pressure associated with the delays in the project, yet this does not seem like an appropriate response considering the continued disregard for the DBE requirements of ACS's contract. As a result of this experience I'm seriously questioning the district's commitment to the DBE program. Things agreed upon in one-on-one meeting are ignored in group meetings and emails. Putting our office in an awkward position, as the support we've believed to of had in reality is completely artificial. Until the rest of the district recognizes the need to support the DBE program I fear that we may be headed for bigger problems should this trend continue.

I will do my best to advise in the best interest of the district relative to the DBE program, but my limited influence will not be enough to keep the district in compliance. It will take a collective and collaborative effort fueled by Top-down support.

34.     Then in early November 2011, Gary Googins demanded that Blackfeet provide certain manuals under the agreement. Blackfeet hadn't provided the manuals because Blackfeet still hadn't been paid for the outstanding change orders that ACS/Xerox had indicated would be paid. Michael Washington, in an email to Mr. Googins, wrote:

Gary,

I thought that the proposed communication plan required all directives from RTD to go through ACS? The directives from RTD to Blackfeet may be problematic

considering the current contractual disputes between ACS and Blackfeet which includes the manuals. As we agreed on in our last meeting, RTD's contract is with ACS. It's clear from Blackfeet's response to your request, that we are complicating their disputes via our direct request for deliverables.

This is an example as to why the change order execution should have been contingent upon resolution of ACS's disputes with Blackfeet. I'm of the opinion that we stray away from initiating conversation with Blackfeet directly until resolution between the parties is achieved. Further direct communication with Blackfeet can implicate RTD should ACS attempt to remove Blackfeet unjustly. Sincerely,

Mike.

### Blackfeet Tries, With the Help of a Lawyer, to Get ACS/Xerox to Pay the Outstanding Change Orders Throughout 2012

33.    During 2012, Blackfeet made repeated efforts, through its lawyer, William Slamkowski at Jackson Kelly PLLC, to negotiate with ACS/Xerox for payment. As poorly as ACS/Xerox had mismanaged the Smart Card Project, ACS/Xerox mishandled the negotiations by repeatedly going back on promises, raising false arguments and claims, and otherwise conducting itself in an obstinate manner.

34.    Blackfeet indicated it would need to leave the job if ACS/Xerox didn't comply.

35.    Internal emails reveal that in or around July/August 2012, RTD personnel discussed removing Blackfeet from the project. In an email sent August 6, 2012, Tonya Washington sends notes to Jean Jennings of a meeting held that afternoon. It states under "Bus Installation" that: "Gary's conversation with Phil Washington this morning resulted in efforts to bring LinkMont onboard ASAP." There is no reason to believe this is an inaccurate recording of the meeting.

36.    On August 15, 2017, in an email from Mr. Googins to Philippe Gervaise of ACS/Xerox, Googins writes, with respect to removing Blackfeet from the Southwest Corridor phase of the Project:

I was given clear direction by Phil Washington last Monday. If [Blackfeet] stand[s] in the way of completion of the program, then I am to find alternate solutions. That said, its [sic] been 10 days and Phil asked for an update on Linkmont and I had nothing to report which he was very disappointed by.

37.    Philippe responded that ACS/Xerox had drafted a letter requesting "to qualify Linkmont to supplement Blackfeet...."

38.    There was real urgency to replacing/supplementing Blackfeet. In an email sent August 17, 2012, Tonya Anderson sends notes that Anderson took of a meeting to Jean Jennings. Those notes state with respect to bus installation that, "Bruce is concerned that it has been 3 weeks since RTD requested Xerox to bring on another DBE installation firm to complete the bus installations." There is no reason to believe this is an inaccurate recording of the meeting.

39.    Then, per Ms. Anderson's notes to Jean Jennings, in a meeting held August 21, 2017, it was discussed that:

ACS in conversation with LinkMont to perform installations at FT Commerce City and FT Longmont as soon as possible. ACS will notify the RTD DBE office that they are replacing the existing DBE firm and the letter needs to be specific with what Blackfeet can do and what LinkMont will do. Why this is happening and how they are solving the issue. ***ACS does not need to wait for a response from RTD to continue with this plan. ACS will also need to inform Blackfeeet of this plan***. ACS needs to inform RTD of what work [sic]....

(Emphasis added.)

40.    On information and belief, no such notice was ever sent to RTD. Blackfeet never received any such notice nor had any opportunity to respond to it. On January 30, 2013, Philippe Gervaise of ACS/Xerox sent an email to Steve Romero of Blackfeet informing Blackfeet that work had been performed in late December 2012 through another company. Mr. Gervaise further indicated that "...we will consider using Blackfeet if you can make yourselves available to do the work." Likewise, in February 2013 Glenn Moore, Senior Contracts Manager for ACS/Xerox wrote to Blackfeet and to RTD that:

With respect to the prospects for future installation work under Blackfeet's Subcontract with ACS (the "Subcontract"), Philippe sent Blackfeet and [sic] e-mail on 2/13/13 wherein we reiterated that ACS' contract with RTD and the Subcontract call for installation on 1031 buses, and only 960 have been worked to date. Therefore, it's very likely that ACS will call upon Blackfeet to perform installations on additional buses going forward although we don't yet know RTD's intended timetable for that work.

41.    Several weeks passed and Blackfeet received no further response from ACS/Xerox.

***Receiving No Further Indication that Work Was Forthcoming, Blackfeet Filed a Complaint with RTD's Civil Rights Division***

42.    Having been unable to resolve the issue, on February 3, 2014, Blackfeet filed a Complaint with the RTD's Civil Rights Division. (*See* "December 12, 2014 Report of RTD Civil Rights Division," Ex. C.)

43.    Among other things in the Complaint, Blackfeet indicated its belief that RTD had violated the rules of the DBE program and its duty towards Blackfeet as a DBE by: intending to shop Blackfeet's bid on the price for a portion of the Program for platform validator installations; allowing ACS/Xerox to replace/remove Blackfeet without due process; allowing ACS/Xerox to delay the project while Blackfeet absorbed over $400,000 in additional costs (and without requiring prompt payment by ACS/Xerox); allowing ACS/Xerox to exclude Blackfeet from meetings; and through other acts.

44.    Blackfeet's Complaint detailed ACS/Xerox's issues as well but pointed out that, "We understand that our contract is with ACS, but your office is directly responsible to protect us from the deceitful and illegal methods that both RTD and ACS have used to manipulate and control the current outcome of Blackfeet as a subcontractor on this project."

45.    Blackfeet made it clear that it had complaints about both RTD and ACS/Xerox.

46.    Blackfeet thereafter responded to several requests by the Civil Rights division for additional information.

47.    ACS/Xerox denied the claims against it.

48.    In December 2014 RTD issued its report, in which it determined that ACS/Xerox owed Blackfeet at least $27,032.16, but that it could not determine, due to the technical nature of the dispute, whether Blackfeet was owed money on its other claims against ACS/Xerox. RTD's report did not address the claims that RTD had failed to ensure ACS/Xerox's compliance with the DBE program and rules.

49.    On June 12, 2015 ACS Xerox disputed that it owed Blackfeet even the $27,032.16 and stated that it had terminated Blackfeet from the project (despite previously indicating that Blackfeet would still have the opportunity to return and perform additional work).

50.    In September 2015, RTD Civil Rights Division indicated that the parties were locked in their dispute and that it was going to close its file. At no point did RTD Civil Rights division ever address the claims by Blackfeet that RTD had denied it due process of law or its other complaints against RTD.

**SUMMARY OF THE CLAIM**

51.    RTD's form contract—that it uses on all projects that receive funds from the Federal Transit Administration[3]—violates 49 C.F.R. § 26.53(f). That is, DBEs like Blackfeet have certain protections under Federal law against being summarily terminated or replaced on federal contracts.

52.    The regulations provide that the prime contractor (here, ACS/Xerox) must use the specific DBEs listed in its prime contract to perform the specific work and to supply the specific

---

[3] See Attachment A "Prime Contract Flowdowns," to Ex. A hereto, the Project Contract.

materials for which each DBE is listed. Any deviation requires written permission from the recipient of federal funds (here, RTD). 49 C.F.R. § 26.53(f)(1)(ii) (requiring written contract provisions).

53.    Permission isn't handed out freely either. Rather, the recipient "may provide such written consent only if [the recipient] agree[s], for reasons stated in [its] concurrence document, that the prime contractor has good cause to terminate the DBE firm." 49 C.F.R. § 26.53(f)(2).

54.    Further, before a prime contractor like ACS/Xerox can terminate a DBE, "the prime contractor must give notice in writing to the DBE subcontractor, with a copy [to the recipient of federal funds, here RTD], of its intent to request to terminate and/or substitute, and the reason for the request." 49 C.F.R. § 26.53(f)(4).

55.    Also, the prime contractor (ACS/Xerox) "must give the DBE five days to respond to the prime contractor's notice and advise you and the contractor of the reasons, if any, why it objects to the proposed termination of its subcontract...." 49 C.F.R. § 26.53(f)(5).

56.    Hence, to terminate or replace a DBE, the prime contractor must give both the DBE and RTD advance written notice of its intent to take such action and the reasons for the action, and RTD can only approve if there is good cause (examples of which are set forth in § 26.53(f)(3)).

57.    In a naked departure from such requirements, RTD's form FTA terms provide as follows:

> The Contractor must promptly notify RTD, whenever a DBE subcontractor performing Work related to this Contract is terminated or fails to complete its Work, and must make good faith efforts to engage another DBE subcontractor to perform at least the same amount of Work. The contractor may not terminate any DBE subcontractor and perform that Work through its own forces or those of an affiliate without prior written consent of RTD.

(See Project Contract a true and accurate copy of which is attached as Ex A hereto.)

58.    And nowhere does RTD's contract contain "a provision stating:

(A)  That the contractor shall utilize the specific DBEs listed to perform the work and supply the materials for which each is listed unless the contractor obtains your written consent as provided in this paragraph (f); and

(B)  That, unless your consent is provided under this paragraph (f), the contractor shall not be entitled to any payment for work or material unless it is performed or supplied by the listed DBE.

59.    Such material terms and omissions amount to an improper abdication by RTD of its duty to protect DBEs like Blackfeet for summary termination. Among other things:

- Instead of requiring that prime contractors like ACS/Xerox provide a pre-termination notice of intent, RTD's form contract simply asks for notice "whenever a DBE subcontractor performing Work related to this Contract is terminated";

- No time, let alone five days, is afforded to the DBE to respond to the prime contractor's pre-termination notice of intent;

- Instead of requiring a good cause finding by RTD and articulating that finding in its "concurrence document," RTD's contract removes that part of the process entirely.

60.     In this case, as improperly contemplated by the prime agreement between RTD and ACS/Xerox, ACS/Xerox terminated Plaintiff Blackfeet by simply discussing with RTD that it may terminate Blackfeet. No prior notice or five-day period was provided to Blackfeet and RTD never made any finding of good cause for the termination in any "concurrence document." Indeed, as contemplated by the prime agreement, no such document was required, and as confirmed in emails, RTD did not believe that it had to make any such good cause determination.

61.    Rather than demand that ACS/Xerox follow termination procedures, RTD officials actually actively encouraged ACS/Xerox to terminate and replace Blackfeet. And although RTD officials required that notice be sent to Blackfeet, this was never done and no five day period was afforded to Blackfeet. Nevertheless, RTD simply ignored ACS/Xerox's failures.

62.    Blackfeet complained to RTD's civil rights division about RTD's skirting of the process and regarding ACS/Xerox's continued failures, throughout the life of the project, to meet program deadlines, adhere to the contract's requirements, and make timely payments.

63.    ACS/Xerox disputed the amounts due to Blackfeet. RTD determined that Blackfeet was owed at least $27,016.32, but that other issues would need to be litigated to determine whether ACS/Xerox or Blackfeet was correct in their interpretations of what was owed under the agreement. ACS/Xerox refused to pay even the $27,016.32, indicating instead that it disputed that it owed anything to Blackfeet.

64.    At no time did RTD articulate a finding of good cause to terminate Blackfeet, and the RTD Civil Rights division failed to address the fact that RTD had permitted Blackfeet to be terminated without prior notice, without an opportunity to respond, and without a good cause finding in any concurrence document.

65.    On information and belief, RTD used the same form agreement for its prime contracts containing identical language regarding the ability of prime contractors to remove DBEs. As such, hundreds of DBEs, potentially more, have been subject to RTD's unlawful contract provisions and concomitant policies and practices, which the Court should declare unlawful and provide other relief.

### CLASS ALLEGATIONS

66.    Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

67.    This class action is brought by Plaintiff on behalf of a nationwide Class defined as follows:

> All DBE's nationwide who entered into a subcontractor agreement with RTD where RTD's FTA Terms, Rev. 3/13/09, was incorporated into the agreement.

17

Excluded from the Class are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and their current or former, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; and (4) the legal representatives, successors or assigns of any such excluded persons. Plaintiff anticipates that amending the Class Definitions may become necessary following discovery.

68.    Plaintiff sues on its own behalf and on behalf of the above-defined Class under Rule 23(a) and (b) of the Federal Rules of Civil Procedure.

69.    Plaintiff does not know the exact size or identities of the members of the proposed Class since such information is in the exclusive control of Defendant. The Class encompass over fifty, and potentially hundreds, of DBEs whose identities can be readily determined from Defendant's books and records. Joinder is impracticable.

70.    There are questions of law and fact that are common to the respective Class members and that are subject to common proof and predominate over any questions affecting only individual members of the Class. These questions include, but are not limited to the following:

a.    Whether RTD's Form FTA Terms governing DBEs violate 49 C.F.R. § 26.53(f);

b.    Whether RTD permits prime contractors like ACS/Xerox to terminate, replace, or supplement DBEs without a 5 day notice, opportunity to be heard, and a good cause finding by RTD; and

c.    Whether RTD serially violates the Civil Rights of DBEs.

71.    Plaintiff's claims are typical of the claims of the Class and do not conflict with the interests of any other members of the Class in that everyone had the same contract, both the

Plaintiff and the other members of the Class were subject to the same conduct, and RTD failed to ensure that its prime contractors provided any DBEs with the required 5-day notice or that any DBEs had an opportunity to be heard. Likewise, RTD failed to provide finding of good cause to any of them.

72.    Plaintiff will fairly and adequately represent the interests of the Class, is committed to the vigorous prosecution of the claims, and has retained attorneys who are qualified to pursue this litigation and have experience in class actions.

73.    This class action meets both the requirements of Fed. R. Civ. P. 23(b)(2) and Fed. R. Civ. P. 23(b)(3).

74.    RTD has acted or refused to act on grounds that apply generally to the Class so that final injunctive relief and corresponding declaratory relief is appropriate with respect to the Classes as a whole. The entire Class is entitled to the same declaration: that RTD's Form FTA Terms governing DBEs, Rev. 3/13/09, violate 49 C.F.R. § 26.53(f). The answer is exactly the same on this point for everyone.

75.    Common issues predominate and are central to the litigation over any perceived individual issues. Whether RTD's form contract and concomitant policies violate or adhere to 49 C.F.R. § 26.53(f) goes to the very heart of the matter and will drive the litigation.

76.    A class action is also superior to other methods for the fast and efficient adjudication of this controversy. No other avenue for relief is available. Further, a class action regarding the issues in this case does not create any problems of manageability.

**COUNT I**
**Violation of the Fourteenth Amendment and Due Process**
**Civil Rights Act of 1964, 28 U.S.C. § 1983 *et seq*.**
**(On Behalf of Plaintiff Blackfeet and all Others Similarly Situated)**

77.    Plaintiff realleges the foregoing allegations as if set forth fully herein.

78.     By being denied the five-day notice, opportunity to respond and be heard, and a "good cause" finding for its replacement, Blackfeet has been deprived rights secured to it by the Constitution of the United States and through 49 C.F.R. § 26.53.

79.     The deprivation of rights was committed under color of state law. RTD, a state actor, failed to require that ACS/Xerox provide 5 days notice to Blackfeet (or if there was any such requirement it was never enforced), failed to provide Blackfeet with an opportunity to be heard, and failed to make a finding of good cause to support Blackfeet's termination or replacement. RTD also inserted language in its prime contracts, the Form FTA Terms, that contain improper provisions and fail to contain other language specifically required by 49 C.F.R. § 26.53.

80.     RTD is charged with ensuring compliance with the DBE rules and programs among its prime contractors. RTD, by using the form contract described herein and through its enforcement of policies that similarly violate 49 C.F.R. § 26.53 when it comes to protecting its DBEs from prime contractor overreach, serially fails to protect DBEs like Blackfeet or otherwise ensure compliance with the DBE regulations and rules by its prime contractors.

81.     As an actual and proximate result of RTD's violations of the DBE rules, including its use of an improper form contract, its failure to require 5 days notice and to afford the DBE 5 days to respond and be heard, and its failure to issue good cause findings prior to approving DBE terminations and removals, RTD has denied Blackfeet due process rights as secured by the Fourteenth Amendment to the United States Constitution and in violation of 28 U.S.C. § 1983.

82.     As a result of such violations, Plaintiff seeks all actual and statutory damages available under the law, together with costs and reasonable attorneys' fees.

83.    Plaintiff also seeks an injunction prohibiting RTD from using its form FTA Terms in any future contracts and from its other violations of 49 C.F.R. § 26.53 and for such other relief as the Court deems reasonable and just.

**COUNT II**
**Claim for Declaratory Relief**
**(On Behalf of Plaintiff Blackfeet and all Others Similarly Situated)**

84.    Plaintiff realleges the foregoing allegations as if set forth fully herein.

85.    All class members were subjected to the same form contract: RTD's FTA Terms, Rev. 3/13/09.

86.    That form agreement provides that:

The Contractor must promptly notify RTD, whenever a DBE subcontractor performing Work related to this Contract is terminated or fails to complete its Work, and must make good faith efforts to engage another DBE subcontractor to perform at least the same amount of Work. The contractor may not terminate any DBE subcontractor and perform that Work through its own forces or those of an affiliate without prior written consent of RTD.

(*See* Project Contract, Ex A hereto.)

87.    And nowhere does RTD's contract contain "a provision stating:

(A)  That the contractor shall utilize the specific DBEs listed to perform the work and supply the materials for which each is listed unless the contractor obtains your written consent as provided in this paragraph (f); and

(B)  That, unless your consent is provided under this paragraph (f), the contractor shall not be entitled to any payment for work or material unless it is performed or supplied by the listed DBE.

88.    All Class Members are entitled to a declaration from this Court clarifying their rights and obligations under such language, specifically a declaration that states such language and omissions violate the plain language of 49 C.F.R. § 26.53.

89.    As every class member was provided with identical contract terms, the answer as to what the Court may declare will be identical for everyone in the Class.

90.     Wherefore, Blackfeet respectfully prays for a declaration from this Court that RTD's FTA Terms, Rev. 3/13/09 violate 49 C.F.R. § 26.53.

## PRAYER FOR RELIEF

**WHEREFORE,** in light of the foregoing, Plaintiff Blackfeet, on behalf of itself and a Class of all others similarly situated, respectfully prays that the Court enter an Order:

a.     Certifying this action as a Class Action, appointing Blackfeet as Class Representative and its Counsel as Class Counsel;

b.     Entering judgment against Defendant and in favor of Plaintiff and the Class on all claims for damages and other relief;

c.     Declaring that RTD's form FTA Terms violate 49 C.F.R. § 26.53 and enjoining future violations;

d.     Awarding damages for emotional pain, suffering and other actual, non-economic damages caused by Green Tree's wrongful and fraudulent servicing practices;

e.     Awarding Plaintiff reasonable attorneys' fees and costs; and

f.     Awarding such additional relief as the Court deems necessary and just.


Dated: June 12, 2017                     Respectfully submitted,


   /s/ Steven L. Woodrow
   One of Plaintiff's Attorneys

Steven L. Woodrow #43140
swoodrow@woodrow.com
Patrick H. Peluso #47642
ppeluso@woodrowpeluso.com
Woodrow & Peluso, LLC
3900 E. Mexico Ave., Ste. 300
Denver, Colorado 80210
Telephone: (720) 213-0675
Facsimile: (303) 927-0809

22

*Attorneys for Plaintiff and the Putative Class*